Good morning, Your Honor. I'm Barbara Mather. I'm going to represent VFB, which is a succession to VFR. Are you going to say time? Pardon? Are you going to say time? I am going to say two minutes. Judge, there is now a Court of Appeals judge. I know that, Your Honor. I know you are. Why is it wrong? It's wrong because when he decided the fraudulent transfer issue and decided that there was reasonably equivalent value received, he relied on measures of value that were fatally inflated by the overstated earnings and projections that Campbell had provided for the spun-off penalty lawsuit. Basically, in my opinion, the judge is relying on market capitalization right after the spin, and he's relying on several other measures of value, all of which turn on the earnings and the projections that were done at the time of the spin. Well, it seems to me they turned primarily on stock market valuation, which is based on what the stock is trading for in the market. That's right, Your Honor. What's the matter with that? Well, the problem with it, as even this judge recognized and certainly the cases in the circuit have recognized, is that market cap works as a measure of value only if the market has captured information. Yeah, well, that's another reason to bind another question. Your case seems to be based on the nondisclosure of this product forcing or attempting to sell more product currently than it's usual in order for these people to earn their bonus. You know, these admittedly or apparently there wasn't any direct disclosure that that was going on, but it would certainly seem to me it would enhance the sales over a relevant period, and stock market analysts or security analysts could detect that the sales are being enhanced, and they'd ask some questions about why they're being enhanced and call up the customers of the company. I mean, you don't have to have a formal disclosure to the SEC for the information to get into the stock market. Well, but, Your Honor, one of the things I think you have to understand about this case is that the judge, and what Judge Slobiter has said is a very detailed and lengthy opinion, made a number of findings expressly that critical information, in fact, was not revealed to the market. And the law in this circuit under the principle of taste is that projections need to be reasonable, and that the reasonableness needs to be tested by the objective standard anchored in actual performance. Let me talk a little bit about what the judge actually found here. And while the product loading is part of it, Your Honor, it's by no means all of it. Well, it's the part that you rely on very heavily, though, it seems to me. I rely on the loading, Your Honor, but I also rely on a number of other things, and they're not things that are just arguments here. They're things that the judge actually found in the record. He didn't find, though, how many dollars were involved in this loading. No, he didn't. We're talking about comparative valuations, but maybe there was some loading, but I don't know if it amounted to $100,000 or $50 billion or how, you know. How did it affect the valuation? Well, the expert for the plaintiffs said that it dropped the EBIT from approximately 130, which is what Campbell's was projecting, to around, into the 50s. And, in fact, that's about what Glassick earned in the first year. Well, apparently the judge didn't believe that expert. Well, that could be, Your Honor, but if we're going to check the testimony against the actual performance, which is what Moody says, there's a significant issue with the projections going out into the market that are at 130 million earnings and the actual earnings are at 55. Now, the judge made a number of specific findings in the range from 40 to 53 in his findings of fact. He found, as you suggested, that Campbell engaged in extraordinary product loading in 97 and in the eight months of 98 right prior to the spin. He found that because the Campbell executives had bonuses riding on sales targets that they undertook to defer trade spending, which is not product loading, Your Honor. It's another issue. Sell assets and load product to meet those targets. Well, I assume product loading involves discounting primarily, doesn't it? It involves discount. It involves trade expansion, pushing product out into the market, Your Honor. And not only was there loading which exaggerated earlier earnings and, of course, has the effect of making it very difficult to meet targets in the future because you've got a lot of product out there already, but also there was an under-approval of the expenses that are No, but, I mean, you force the product down to the customers by reducing the price. I mean, that's I think in this business, Your Honor, there actually is a significant chance for that. But whatever. Thank you for the introduction. He specifically found that the product loading artificially increased VFI's earnings in the 12 months prior to the spin and that the securities market was unaware of that loading. He found that VFI's Form 10 filed with the SEC at the spin had not been entirely reliable because the financial results for Swanson, one of the largest entities that was transferred, had been submitted and inflated. The Form 10 describes a business poised for growth and for acquisitions, but the judge, in fact, found that most of the businesses had declining growth prospects and should be managed for cash. One Campbell executive even referred to them as dogs. I mean, the difference in valuations that he found amounted to how much? Five hundred million dollars, right? The judge said that apparently the consideration placed on these companies that were spun off was five hundred million dollars more than their value. The judge said that the market cap was 1.1, Your Honor, and that the transfer was about five hundred million. Well, the difference is five hundred million, right? Would have raised it to 647. Is there any evidence that this market product forcing amounted to a change of valuation of five hundred million dollars? I mean, that's what I find lacking in this case. There are a lot of generalities, but there's not much specific evidence of how many dollars were involved. Well, but the problem, Your Honor, is it's lacking in the opinion below, too. The judge basically makes a finding that we should take that measure that you have accurately stated between the market cap and indebted assumed, and that that is the value. The difficulty is, at the same time, he says that the market cap, which obviously turns on earnings that are being reported in the last year, last year before Campbell spins the company and on the projections, are not reliable, that they are based on information that is not reported. And there is no quantification in the record of exactly what the effect of that is by the judge. There is ample evidence, Your Honor, that it was very substantial. Housley, the defendant's expert, said that the value of the company was something like $300,000. Ms. Mather, you've pointed out flaws in the district court's opinion. Now, the standard we have before us is clear error, and it was the burden of the VFB to prove not reasonably equivalent. How did the court clearly err in these findings? And by that I mean what is in the record from an evidentiary standpoint that he rejected or that he rejected in terms of the proof that you offered to prove and show and demonstrate the lack of reasonably equivalent value? The standard is not in the record, Your Honor. For his findings on value? It is clear error for his specific findings, but as the Moody case makes very clear, the issue of what rules to apply and how to apply them to the findings is a matter of law and is subject to primary review. But what evidence, what should he have said, ah-ha, I have this to hang my hat on that this was not reasonably equivalent value because this was the value as compared to this? The evidence in the record, Your Honor, is Mr. Owsley's discussion of the discounts that needed to be taken from the inflated earnings. And where in your brief do you bolster and embrace Mr. Owsley's? Well, I think you'll find it primarily, Your Honor, in the reply brief. Shouldn't that have been your main thrust, that this expert testified to X and that fulfilled our burden of proving lack of reasonably equivalent value? I mean, I don't think you can just chip away. I think you have a burden here. We do have a burden, Your Honor, but the judge has a requirement to take the Moody standard, which is to test projections against reality to determine whether they're reasonable. That's what the case says, Your Honor. And if, in fact, his specific findings here say that the earnings were not accurately reflected, then you can't simply go from there to market capitalization and say you have a basis for a determination. The basis is wrong. It's wrong on his own findings. It's wrong as a matter of law in terms of application of Moody. And it doesn't take into account the discounted cash flow analysis that Owsley presented. Where is your Moody discussion in your blue brief? I must admit I'm missing it. I think it's in the reply brief. These are not small differences. The Owsley chart, which is at page 25 of the reply brief, lays out what the actual projections were. Campbell's estimate, which is flawed in all the ways that the judge sets forth in his findings that I cited to you, was that the EBIT for Blasek would be $143 million in 1998. The actual EBIT was $55. The projection for $99 is $162. The actual EBIT is $42. What do you do with the $200 million bond offering in 1999? Your Honor, this is a situation where, first of all, the $200 bond offering, you need to understand the replacement. It's not new borrowing. It's simply a division of the existing borrowing into bonds and bank debts. Somebody bought in to what has to be there after assets are gone. I agree, Your Honor. The bond debt was sold prior to. What happened here, Your Honor, is that these items, these costs, which had been incurred in the period prior to the spin, were slowly coming out over time. The last one finally appeared in January of 2000. In January of 2000, the fact that there had been under-reporting of trade spending going back all the way into the period before Campbell spun the company was the slowest in the market. Now, trade spending is something different than product forcing. It is, Your Honor. That's an expense item.  The other was that it was depressed in the period before, under-reported in the period before the spin, which has the effect of inflated earnings. And then in January of 2000, Blasek had been using the estimates growing out of the prior experience. They finally had to reconcile as a new computer system came up. And when they did that, they discovered that they had trade spending of $15 million that they had to take against earnings. Part of that, and there's testimony by Mr. Adler in the record, 5 to 10 million of it goes back to the pre-spin period. The pre-spin period, when that final disclosure was made, Judge Rendell, the bonds crashed. There was nothing there. These disclosures came out over an extended period of time. Let me clarify. You represent creditors, not shareholders of BFB. I represent the successor to the trustee or the debtor. Effectively, I represent creditors. However, Your Honor, it's clear the judge found the outstanding. And in addition, under the plan here, Your Honor, we are the successors to the claims of BFB. If the court has other questions, I'm pleased to answer them. There wasn't any downgrading of the bonds until the company had been operating for a couple of years. Is that right? That's true, Your Honor. But the downgrading and the crash of the bonds occurred immediately after the last of the disclosures related to this pre-spin period. And it's not a single item, Your Honor. It is a series of items where Campbell inflated hearings, pre-spin, and then used those as a basis of projection. The judge identified many of those, but then he continued to rely on market values that came off of those very same things. And the bankers apparently underwrote the bond issue sight unseen. They had so much confidence in the numbers, they didn't think they had to audit them. Well, Your Honor, like everybody else in this game, they didn't have all the numbers, and that's a problem. And, in fact, they didn't have all the numbers related not to later periods but to the beginning. This is not a hindsight case, Your Honor. This is a case where all of these things were known and knowable at the time of the spin, and they were not reported. You can't rely on market values in that kind of a situation. Thank you. Thank you, Judge. Good morning, Your Honor. May it please the Court, I'm Michael Schwartz of the Lock, Tail, Lift, and Roses and Pets firm. I'm here this morning on behalf of Appellee's Camel Sioux Company and its affiliates as co-counsel of the Blank Rome firm of this city, with whom we tried the case before the court. The judge, as Your Honor noted, filed a lengthy, detailed interview. The judge did his job of deciding the case that was tried before him. He gave a plaintiff every possible procedural opportunity to prove his case. He devoted three weeks of trial time to the trial. He gave him the leave to call no fewer than five valuation experts. He ruled that a three-day pick was a pick of the litter. And the judge issued detailed findings, in fact, of the prudence of the law in which he decided that the value of the company was $1.6 billion, Your Honor, Judge Clayton, almost more than three times the amount of debt that was assumed in the transaction. It was, therefore, reasonably equivalent value by a country mile, and the company was obviously solid by a country mile. The judge, in accordance with this Court's instructions in the RML case, considered... If the judge was right, Campbell kind of gave these subsidiaries away, didn't he? They didn't give it away, Your Honor. You have to understand, the spinoff was an asset going to Campbell's own shareholders. It would be a private matter, obviously, if Campbell was selling it, and the upsides were the business was going to go into the hands of a purchaser. But this was a transaction in the family. They really didn't do anything except structurally free up the remaining company. I mean, the shareholders kept the value. That's right. The concept was, as Judge Jordan found, that you had pools of assets that required very different management styles. There was the Campbell pool of assets, the very, very successful brand names, and there were smaller brands that required being managed for cash. And you split those up. The shareholders had both, and they had the upside that it was a marital problem. Now, I'm trying to get my arms around exactly what this marital problem is. Most of their briefs, both the original and the replied brief, deal with the fraudulent... Not with the fraudulent transfer issue, but with the so-called breach of the new Sherry Doody issue. But you can't get there until you get determination of the value of the company. Exactly right. No matter what legal theory is advanced here, the key question was, what was the value of the assets on the day of the scandal? That is obviously the key legal issue with respect to the fraudulent transfer case. It's equally the issue with respect to the new Sherry Doody case, because the claim that was being alleged here was that they had standing as creditors, which you look at paragraph 44 of their submission to Judge Jordan in post-trial submissions. They said that the directors had a duty to, quote, foreseeable creditors. New Jersey law, which governs, by the way, all the issues in this case, state law issues, New Jersey law is crystal clear. There's no fiduciary duty to creditors in the absence of quote, insolvency. So once again, you're right back to the valuation issue. And of course, Judge Bender is exactly right. This Court's decisions are crystal clear that valuation of assets is due to clear error and clear error only. And this Court's standard for what constitutes clear error is very high indeed. I'll take the liberty of repeating it. There has to be a fine phrase. That's one of the words exactly right. Completely devoid of a credible evidentiary basis, or bearing no rational relationship to supporting data. In honor of Judge Cuddy's participation this morning, I took a look at how they articulate the civilist end of the Seventh Circuit, and it turned out to be a very colorless expression of it. In fact, to be clearly erroneous, quote, it must strike us as wrong with the force of a five-week-old, unrefrigerated, damned fish. We can't import that standard. Is that Esther Brock? Was that Esther Brock? No, it was Bauer, I think. Oh, it was Bauer. You referred to that, Your Honor, as an olfactory response statement. However the standards articulate, no fair-minded reader of Judge Jordan's decision could say it is completely devoid of credible evidence, or bears no rational relationship to the facts presented, or smells like a dead fish. I don't refer to it as a dead fish, right. Okay. Now, that, therefore, is the end of the case, both in terms of fraudulent transfer and in terms of judiciary review. There is simply no basis for this Court to reverse those findings. I want to use some of my time here to address some specific points that this matter may be, because they are way off the base. And the first, let's start just with the issue of what happened to this Court. In their opening brief, the blue brief, as you quoted Judge O'Donnell, here's what was not even mentioned. Owsley is not defendant. I mean, his name occurs once in a footnote on page 50-something or other. I'm not sure that doesn't amount to a waiver of their ability now to rely upon Owsley. There are cases in this Court which say that something is not set forth fairly in the opening brief. You can't bring it into the refinery. So, as far as evidence is Owsley, I think the Court has an issue of waiver. Second, Mooney is not only not discussed in the opening brief, it's not even cited in the opening brief. Third, the bond offer is also never mentioned in the opening brief. So, in terms of how things happen in this Court and the orderly proceedings in this Court, it seems to me that this is an appeal that falls far short of any reasonable standard of diligence. Second, she talks about this Mooney case, which is, of course, a very important decision on the issue of capital inheritance. And she says that what Mooney requires, her account, is that you have to look for the projections came true in the future. And she quotes Langdon, which is found on page 1073 of 971-X-70, that the projections quote must be tested by an objective standard anchored on the company's actual performance. And in the brief, the words actual performance are in boldface type. In other words, for a little hindsight, let's see what happened. But if you look at what this Court actually wrote on page 1073 of 971-X-70, it ignores no such hindsight test. The language of being at peace so boldly, quote, plainly refers not to the debtor's future actual performance, but to its historical past actual performance, which is exactly what Judge Jordan understood it to be. If you look at page 1073, right after the phrase they put in boldface twice, this Court stated, quote, however, relies on historical data is not enough. Historical data. The FBI never quotes that much. Where in their reply brief are they citing to that page? I can find it. It's throughout the reply brief, which makes it difficult to find. Pass them. Pass them. Well, that means it's everywhere. That's the problem. Well, let me find it. Here it is. I just turned it. I'm having a good morning. Page 14 of the reply brief. That's something you can't project. You have to look at it. It's the afternoon show. Anchored in the company's actual performance. And they're reading it to mean future performance. Not only did this Court use the word historical data to qualify what eventually actual performance, but this Court, in discussing this precise issue, cited to a leading case on this issue, happens to come from the District Court in California, called the credit managers case. That comes right after the sentence that they are calling an indication of a heist. And here's the language in credit managers, which this Court was citing. Quote, the Court's task in determining whether Crescent had sufficient capital as evidenced by cash flow projections is not to examine what happened to Crescent or whether the projections as modified were proven. So this whole account of the Moody case that they gave you is absolutely false for what this Court held. And it's hard to see how you can miss that. Now, there's a lot of discussion in this matter's presentation of this loading question. And her account of what the judge did and didn't find about that, with all due respect to this matter, is not reliable. I will walk you through what he did and didn't find. Basically, of course, as Adele has said, this is a valuation. So the issue is, what impact on valuation did the loading have? First finding the judge makes, okay, day 73, from the evidence presented, I cannot determine exactly how much loading occurred and the extent to which it affects me. I cannot determine. They have the verdict of proof. If he cannot determine it, they lose. Second, even Housley, their expert, although abandoned by them in their opening brief, made no more of a claim than that the pre-spent EDIP was increased by $14.8 million by virtue of loading. That's finding the fact, I'm sorry, conclusion of Law 23 on page 874. By the way, our expert's number comparable to that was 3.2 million. But the point that is crucial on the valuation issue is, and if I may say so, Your Honor, Judge Carnegie, which was disclosed to the market, Jordan made a specific finding, its conclusion of Law 24, that the information in the market was that the profit impact was 17.5 million. In other words, higher than the number Mr. Housley used, and of course, much higher than the number our expert used. And what was the stock doing when that information was clearly in the market? The market cap of the company was $900 million. With information in the marketplace involving a higher number than the one that Housley testified to, or than the other two experts, particularly Coleman, testified to. There is a consistent pattern in the opening brief, in the reply brief, and this morning, of ignoring a crucial part of Judge Jordan's decision. They argued that certain facts weren't disclosed to the market, and accordingly, the market price wasn't trustworthy. I might add, they did not argue that the market price is not evidence to be looked at. Their point was, the particular market price of the particular circumstance was deprived of information that should have been. Judge Jordan was a very careful trial judge. Obviously, they had made that argument to him. So what did he do?  And he devotes literally 12 paragraphs of his opinion, this is in the conclusions of Law 22 to 33, to a careful event study, paragraph after paragraph, taking up what the disclosures are, what they say should have been made, the loading, I'm not going to remember them all, but there's a whole linear, and concluding that like all these things were unquestionably known to the market, the price of the stock traded at the same level as it did when the stock came out on the spin-off day. Conclusively determined in a careful, dispassionate way that the claim that the price of the opium was too high because of the economy's closures was unproven. This series of paragraphs, 22 to 33 in the conclusions of Law, are not mentioned in the opening brief, they're not mentioned in the reply brief, and they weren't mentioned this morning. They are directly responsive to this court contention. There are, Judge Rendell, one of the earlier lawyers, asked him, what's a district judge to do? Well, he understood the district judge, listened to the case they put on, made specific findings about it, and under his trouble, he's held before this court, and his findings on that precise issue go unmentioned, much less do they establish that those findings were clearly erroneous or smelled like the 7th Circuit's pastiche. I must say, the whole performance here calls to mind the oft-quoted remark of Claire Booth Luce in which she said, no good deed goes unpunished. Again, Judge Jordan gave them three weeks of trial, five expert witnesses they wanted to look at, to actually address all of their contentions, and they make no response at all. Instead, they bring up a bunch of arguments about reduced sharing duties, which are first of all foreclosed by their failure to establish the evaluation case, as I previously discussed. But there are a bunch of legal arguments they put forward here, again, particularly in the reply room, which are totally unsound on their merits, but which were never presented to Judge Jordan. I mean, their presentation, at least in their briefs, is permeated with arguments that were never made to him. My time is running short. I'm not going to take a lot of time going through. A good rule of thumb, Your Honors, is this. If they're arguing something, and there's not something about it that Judge Jordan submitted, it's because they didn't ask him to decide. In particular, they tell you in their reply brief, there's some big important issue with New Jersey law that you have to decide, with respect to whether or not New Jersey would or would not follow the Anadarko case of the Delaware Supreme Court. Well, first place, no such argument was made to Judge Jordan. The Anadarko case is not even cited. The judge left each side file 150 pages of post-trial, post-conclusion, and findings. The Anadarko case is not even cited, in any of their proposed findings. Second of all, the argument which asks this federal court to decide a novel question of New Jersey corporate law is not properly before the court for another reason. Because regardless of what the New Jersey rule may be in the Anadarko situation, the Francis case, which the judge did rely on a decision of the Supreme Court of New Jersey, unanimous, recent, thorough, well-recent, says that there is no fiduciary duty owed to the creditors in the absence of insolvency. Anadarko has nothing to do with insolvency. Would you comment on your claims against the bankruptcy? Yes. We have filed unsecured claims. Let me see if I have a little list here. Based upon liabilities of VFI under the Separation and Distribution Agreement, that was the contract under which the spin-off was conducted. We also had various... What kinds of claims were really at issue there? Well, can I proceed? Well, obviously, I have to do an answer question. There are, for one thing, indemnity claims. Under the Separation and Distribution Agreement, they were foreclosed from challenging the transactions on fiduciary duty grounds, which, of course, is what their whole presentation is going to explore. We also supplied them with goods and services, and there are unpaid receivables for monies advanced. That's the nature of our claims. Okay. Are there no claims that preceded the spin-off? No. There's a claim that follows. It's a part of a ride on the spin-off agreement itself. Did you have any questions of him? No. Thank you. Okay, thank you. What's the matter? I know that you haven't replied, but could you just briefly address this claim business? Why? Why they shouldn't be allowed. Yeah, why they shouldn't be allowed. I know you're focused on the other issues. Okay, go ahead. Why don't you talk about what you were going to talk about, and then we'll catch up. Okay. Let me just, Your Honor, I apologize for the order of citation. The movie is cited and discussed at length in the refinery, and it does not, as my reporting opponent says, speak only of past data. It talks about projections, and it says, because projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance. What was wrong here was not only that the company's projections were ludicrously high, more than double what they made, but in fact that they were, in addition, grossly inflated in many ways that the judge in fact found in the actual performance period prior to the spin. But what was the value that you proved? We had two valuation experts, Your Honor. One was Owsley, who put a value of $250 to $300 million. But if you didn't argue in your opening brief that his valuation was so unassailable and so excellent that it was clear error for the judge to look elsewhere, why should we give any credence to that concept? Your Honor, I don't believe this case is to be decided under a clear error basis. The judge had a number of valuations before him, almost all the ones that he provided. What is the standard? The standard is, as Moody lays out, if he applied the wrong test... No, no, no. It has to be clear error, abuse of discretion, de novo. We have to have some review standard. De novo? No. Oh, that's plenary. That's plenary. Abuse of discretion, Your Honor. Well, there you go. That's the one where if you don't know what it is, you say that's what it is. Well, that's what Judge Seringa said, Your Honor. I'm not making it up. Well, it may be mixed, but finding a value of X is a factual determination. Not if you use projections that are not rooted in reality. And that's exactly what Moody said, Your Honor. And it also says very expressively, Judge Seringa writing, that the analysis of what has to be applied and how it is to be applied is an issue that is... Well, I have to tell you, I really didn't review Moody's that carefully in connection with this case because it wasn't cited in the blue brief. And I think that's really... I'll go back and look at it again. What's the specific relation of projections to valuation at the time of the spinoff? Pardon? What is the specific relation of projections to the value of the subsidiary at the time of the spinoff? When Campbell strung the company, it did a series of... First of all, it had data from the last year, 97, and partial data for 98. And those were inflated in the very ways that the judge stated. And that information was part of what the market had. In addition to that, there were projections that were done by Campbell at $130-plus million worth of earnings for a company that in fact earned $55 in the first year after the spin, two-thirds of which was actually under Campbell's management. So your thesis is the market accepted these numbers without further inquiry? I think it's obvious the market accepted these numbers without further inquiry, Your Honor, for the very reason that you stated. You have a rather naive view of this. Your case has a rather naive view of the stock market, in my opinion. But here the judge expressly found that there was a lot of significant information that wasn't in the market. It's very, very important to say that and he doesn't go back and address that issue when we simply go on from the market. You asked about bankruptcy issues? Yeah, well, because it's in your brief. I mean, you say that the district court shouldn't have accepted that. Yes, there is an issue. One of the bankruptcy issues is whether certain of the claims had been objected to below. And we asked the judge, should we consider that? And he said, no, we'd file an appeal late. And one of the other issues... Was it DeAaron doing that? I think so, Your Honor. Your Honor, the case has been tried all the way on a regular federal rules and civil procedure and appealed in a standard federal rules time period. And there had been at least some objection on the record to the claim. But there's no claim that they weren't... There's no claim that they weren't actual arm's length obligations, is there? That they were, you know, because of the relationship or if they should be seen as equity or anything else. Well, I'll look at it. Okay, that's fine. Anything else? Any other questions? Okay, thank you very much. Case was very well argued, well briefed, and we will take it under advisement. Thank you, Your Honor.